## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 28 2015, 8:53 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT J.G.

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLANT K.M.

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In the Matter of: J.D. and J.G., Children in Need of Services,

J.G. (Father) and K.M. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee (Guardian ad Litem).*

December 28, 2015

Court of Appeals Case No. 49A02-1505-JC-441

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Rosanne T. Ang, Magistrate

Cause Nos. 49D09-1412-JC-3230, 49D09-1412-JC-3231

---

**Bradford, Judge.**

# Case Summary

In December of 2014, Appellants-Respondents K.M. ("Mother") and J.G. ("Father") (collectively, "Parents") had lived together for approximately one year with their three-month-old daughter J.G. and Mother's three-year-old son J.D. (collectively, "the Children"). On December 19, 2014, Mother woke up J.D. to find him with bruising on his face and a bloody nose. Later that day, J.D. was taken to a hospital, which resulted in the involvement of Appellee-Petitioner the Indiana Department of Child Services ("DCS") and the removal of J.D. from Parents' care.

DCS filed petitions to have each of the Children found to be a child in need of services ("CHINS"). After DCS became involved with Parents, it also became increasingly concerned for J.G.'s welfare. Mother had failed to take J.G. to scheduled medical appointments, J.G.'s immunizations were not current, and she had a flat spot on her head, a possible indicator of abuse. Moreover, in January of 2015, when J.G.'s pediatrician told Mother to immediately take J.G. to an emergency room due to low oxygen saturation, there is no record that Mother did so. In February of 2015, J.G. was removed from Parents' care.

Following a fact-finding hearing, the juvenile court found both Children to be CHINS, and ultimately ordered that their relative placements be continued and that Parents participate in services. Father argues that the juvenile court abused

its discretion in finding J.G. to be a CHINS, and Mother argues the juvenile court abused its discretion in finding both Children to be CHINS. Because we conclude that the juvenile court did not abuse its discretion, we affirm.

# Facts and Procedural History

[4] In December of 2014, Parents had lived together for approximately one year with their three-month-old daughter J.G. and Mother's three-year-old son J.D. C.D., J.D.'s father, resides in southern Indiana.[1] Mother used drugs when pregnant with both J.G. and J.D. Records indicate that Mother tested positive for opiates and marijuana while five months pregnant with J.G.

# I. J.D.

[5] On December 19, 2014, Mother woke up J.D. and noticed that he had multiple bruises on his face and a bloody nose. Mother took J.D. to his maternal grandmother's. Later that day, Mother contacted C.D. and told him she thought J.D. had hurt himself hitting his head against the wall while sleeping. C.D. collected J.D. from J.D.'s maternal grandmother's home and noticed that J.D. had "some massive bruises on his face" and "a little bit of dried-up blood in his nose." Tr. p. 71. C.D. took J.D. to St. Francis Hospital to have him evaluated; shortly thereafter, DCS was contacted. Mother and Father reported to DCS that J.D. had behavioral issues and had, at times, hit his head on the

---

[1] C.D. was involved in the proceedings below as a respondent, but does not participate in this appeal.

wall while he slept. Father reported that he was not certain how J.D. received his bruises. J.D. was removed from Parents' care and placed with C.D.

[6] J.D. has several behavioral issues, including kicking, hitting, and punching; difficulty following directions; temper tantrums; and acting out for attention. In August of 2014, J.D. began Head Start. Jacqueline Hiler, one of J.D.'s teachers, described him as "low functioning[.]" Tr. p. 145. According to Hiler, J.D. has verbal, motor, and fine motor skills delays. J.D.'s last day at Head Start was December 18, 2014, and had been placed on a waiting list for Head Start where he now resides with C.D.

[7] Mother testified that J.D. is "a kind of clumsy boy and likes to play around a lot." Tr. p. 62. Hiler, however, while acknowledging that J.D. "was a little clumsy[,]" stated that they did not experience too much trouble from falling at Head Start. Tr. p. 148. J.D.'s paternal grandmother testified that she had seen "some" but "[n]ot a lot" of clumsiness in J.D. Tr. p. 90.

[8] C.D. indicated that he has had concerns regarding bruising on J.D. in the past. In March of 2014, C.D. picked up J.D. and observed bruises on both sides of his face, which Mother claimed J.D. had received when he ran into a doorway. Hiler also indicated that J.D. once had a bruise on his forehead, which required her to prepare a report. Mother testified that J.D. received the bruise from tripping and falling in the bedroom.

## II. J.G.

Case coordinator Stacey Rutledge of Centerpointe Community Based Services became involved with Parents and was assigned to monitor their services. At some point in December of 2014 or January of 2015, Rutledge became concerned because Mother was not ensuring that J.G. attended all of her medical appointments and had not maintained all of J.G.'s immunizations. Rutledge also became concerned about flatness on the back of J.G.'s head, a sign of neglect indicating that J.G. had been lying on her back too much. While Mother agreed to spend more "tummy time" with J.G., she denied that neglect was the cause of the flatness on J.G.'s head. Mother also indicated that she missed medical appointments in October and November of 2014 because they had not been scheduled correctly and one in December because of DCS involvement. Tr. p. 112.

The record indicates that on January 12, 2015, Mother took J.G. to her pediatrician, who discovered that J.G. had low oxygen saturation and instructed Mother to take J.G. to an emergency room immediately. There is no indication that Mother ever took J.G. to an emergency room.[2]

---

[2] The January 12, 2015 incident is addressed in statements by counsel on the record, referring to medical records obtained from J.G.'s pediatrician that were, for whatever reason, not placed into evidence. Neither Mother nor Father, however, dispute on appeal that the pediatrician visit occurred or that there is no record of Mother taking J.G. to an emergency room.

[11] DCS and service providers learned that neither parent has a valid driver's license and became concerned about them driving with J.G. in the car. At times, the Family Case Manager ("FCM") would go to the home to find nobody home and no car in the driveway, only to return later to find the car in the driveway and Parents home.

[12] On February 4, 2015, DCS removed J.G. from Parents' care, and she was placed with her paternal grandmother. Rutledge did not recommend placing J.G. back with Parents, and recommended that Parents needed sixty days of clean drug screens and to be at least halfway done with parenting classes before J.G. is placed back in their care.

## III. Parents' Compliance with Services

[13] Parents' services have been coordinated with Rutledge, who meets with them weekly and goes over their progress with them. When J.G. was still in the home, Parents were assigned an FCM and parent mentor and were provided a minimum of ten hours of in-home services. Since J.G.'s removal, Parents meet only with a parent mentor. Rutledge recommended that Parents continue to meet parent mentor and attend parenting classes in order to learn responsibility and become more proactive parents.

[14] Mother has been having visitation with J.D. twice a week for up to two hours each visit. Mother has not missed any visits and the facilitator Duane Wade does not have any safety concerns. Wade indicated, however, that there have

been times when J.D. needed to use the bathroom and that Mother was unable to understand the gestures he made signaling his need to go.

## IV. Children's Current Placements

Since December 19, 2014, J.D. has been placed with C.D. in southern Indiana. Also residing in the home is C.D.'s mother, her husband, and her adopted daughter. Since being placed with C.D., J.D. has suffered no more bruising or marking to his face and has not been observed hitting his head while sleeping. J.G. is placed with her paternal grandmother.

## V. CHINS Proceedings

On December 23, 2014, DCS filed a petition alleging the Children to be CHINS after J.D. presented at St. Francis Hospital with injuries inconsistent with Parents' explanations. The same day, the juvenile court ordered J.D. placed with C.D. J.G. remained in Parents' care at that time.

On February 4, 2015, DCS moved for the removal of J.G. from Parents' care due to their failure to provide proper medical care. The same day, the juvenile court authorized J.G.'s removal and placement in relative care. On March 3, 2015, the juvenile court held a fact-finding hearing on the CHINS petition. On April 13, 2015, the juvenile court found the Children to be CHINS. The juvenile court's order provided as follows:

> This matter came before the Court on March 3, 2015 for evidence on a Petition Alleging Child in Need of Services ("CHINS") petition filed on December 23, 2014. Petitioner,

Indiana Department of Child Services ("DCS") appeared by counsel Aaron Milewski and Family Case Manager Jennifer Troxail.

The guardian ad litem appeared by Jill English-Cheatam. Respondent [Mother] appeared in person and by counsel, Mary Margaret Montgomery. Respondent [Father] appeared in person and by counsel, Kevin Kolbus. Respondent [C.D.] appeared in person and by counsel, Andrew Arnett. Upon evidence presented, the Court now finds the following by the preponderance of the evidence:

1.    [J.D.] is a minor child, date of birth February 21, 2011.

2.    [J.G.] is a minor child, date of birth September 9, 2004.

3.    [Mother] is [J.D.] and [J.G.]'s mother.

4.    [C.D.] is the father of [J.D.].

5.    [Father] is the father of [J.G.].

6.    At the time of the filing of the petition, the children resided with [Mother] and [Father] at 2630 Fox Harbour Lane in Indianapolis, Indiana.

7.    On December 19, 2014, [J.D.] was observed to have bruising to the front of his forehead, the left side of his forehead and his left eyelid. [J.D.] was also observed to have a bloody nose.

8.    [Mother] and [Father] each testified that they did not witness [J.D.] sustain these injuries. However, [Mother] testified that she believes [J.D.] inflicted the injuries upon himself by striking his head against the wall while sleeping. [Father] testified that he believes that [J.D.] either inflicted the injuries or that he could have tripped or fallen on a toy.

9.    This is not the first occasion where [J.D.] was observed to have sustained an unexplained injury while in [Mother]'s care. In February or March of 2014, [J.D.] was also observed to have bruising to both sides of his face.

10. [J.D.] has been placed with his father, [C.D.], since the filing of this action. [C.D.] does not currently have custody of [J.D.].

11. Subsequent to [J.D.]'s removal from [Mother] and [Father]'s care, the service providers began having concerns regarding [J.G.]'s placement in [Mother] and [Father]'s care. These concerns included illicit substance use on the part of each parent, concerns that the parents are driving with [J.G.] without a valid driver's license or car insurance and concerns that [J.G.] was spending too much time lying on her back. The providers working with the family would not be comfortable with [J.G.] returning to [Mother] and [Father]'s care until these issues are addressed.

12. The Department of Child Services also became concerned for the parents' ability to care for children due to their determination that [J.D.] had not seen a doctor in one and a half years and that [J.G.] had missed regular doctor appointments as well.

13. [J.D.]'s physical or mental condition is seriously impaired or seriously endangered due to an injury by the act or omission of the child's parent, guardian or custodian. On at least two occasions, [J.D.] has sustained injury to both sides of his face while in [Mother]'s care. The Court does not find [Mother]'s explanation that [J.D.] inflicted the most recent injuries in his sleep to be credible. Neither the daycare providers who worked with [J.D.] prior to his removal from [Mother]'s care nor the child's current care providers have witnessed any behaviors from [J.D.] which would support this scenario.

14. [J.D.'s] and [J.G.]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. Until the underlying issues regarding the origin of [J.D.]'s injuries can be addressed, both children are endangered in the care of custody of

[Mother] and [Father]. Additionally, the failure on the part of [Mother] and [Father] to ensure that the children attend their regularly scheduled medical appointments places each child in danger due to their young age and the necessity to ensure that they receive regular care. While no concerns exist regarding [C.D.]'s care of [J.D.] at this time, his lack of custody renders him unable to provide [J.D.] with care without further court order.

15. [J.D.] and [J.G.] need care, treatment, or rehabilitation that they are not receiving and are unlikely to be provided or accepted without the coercive intervention of the court. Therapeutic services are necessary to identify and ameliorate the causes of [J.D.]'s injuries and [Mother] and [Father]'s inability to ensure that the children receive regular care.

Therefore, the coercive intervention of the Court is needed to ensure that the causes are therapeutically addressed prior to the children being returned to [Mother] and [Father]'s care.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that [J.D.] and [J.G.] are children in need of services under Indiana Code 31-34-1-1 and 31-34-1-2.

Father's App. pp. 130-31.

[18] On May 6, 2015, the juvenile court held a dispositional hearing, and entered a Parental Participation Order, which provides as follows:

The Court, having considered the issue of Participation in a treatment program and having conducted a hearing, now orders that a Participation Decree should be entered.

IT IS THEREFORE ORDERED, that [Father] and [Mother are] ordered to do the following:

HOME BASED THERAPY: [Father] and [Mother] will become engage in a home-based therapy program referred by the [FCM] and follow all recommendations.

> ADDITIONAL: [Father] and [Mother] will comply with the
> parent mentor arranged through Centerpointe Systems of Care
> Program and follow all recommendations of this provider.

Father's App. p. 142.

[19] Father and Mother both appeal. Father's argument, restated, is that DCS presented insufficient evidence to sustain the juvenile court's finding that J.G. is a CHINS. Mother contends that DCS presented insufficient evidence to sustain the juvenile court's findings that J.D. and J.G. are CHINS.

# Discussion and Decision

[20] With respect to CHINS determinations, the Indiana Supreme Court has held as follows:

> [a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id.*
>
> …
>
> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not

receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted).

[21] Indiana Code section 31-34-1-1 provides that a child is a CHINS before the child becomes eighteen years of age if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[22] Indiana Code section 31-34-1-2 provides that a child is a CHINS before the child becomes eighteen years of age if:

> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

# I. Father

## A. J.G.

[23] Father argues that DCS failed to produce sufficient evidence to sustain a finding that J.G. is a CHINS. Father argues, essentially, that DCS failed to prove the theory he claims DCS argued below, namely, that J.G. was endangered due to an injury resulting from an act or omission by Parents. *See* Ind. Code § 31-34-1-2(1).

[24] Father's argument ignores the fact that, despite what DCS argued below, the juvenile court clearly found J.G. to be a CHINS based on the conditions listed in Indiana Code section 31-34-1-1, namely that "[J.G.]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision." Father's App. p. 131.

[25] Moreover, we conclude that the juvenile court's finding in this regard is amply supported by the evidence. The juvenile court's order indicates that it based this finding on concerns about Parents' possible drug use, Parents' driving with J.G. despite neither having a valid driver's license, the flat spot on J.G.'s head, and Parents' failure to ensure attendance at scheduled medical appointments. Also very compelling, although not specifically cited by the juvenile court, are indications that J.G. was not taken to an emergency room after J.G.'s pediatrician told Mother to do so immediately. DSC produced sufficient

evidence that J.G. was endangered by Parents' refusal or neglect to provide her with necessary medical care.

[26]  Father also argues that DCS produced insufficient evidence to establish that J.G. was in need of care she was unlikely to receive without coercive intervention of the juvenile court. Again, we disagree. DCS produced evidence that J.G. had missed medical appointments, her immunizations were not updated until after DCS became involved, and she had a flat spot on her head, which is a sign of potential neglect. More significant were Parents' actions (or, rather, inaction) after J.D.'s removal in mid-December of 2014. Although Mother agreed to spend more "tummy time" with J.G. after Rutledge's intervention, she resisted acknowledging that the flat spot on J.G.'s head was a result of neglect, claiming that "the baby has her dad's head." Tr. p. 112. Another and far-more-troubling indicator of Parents' unwillingness to provide J.G. with necessary medical care occurred on January 12, 2015. When J.G.'s pediatrician diagnosed her with low oxygen saturation level, Mother was instructed to immediately take J.G. to an emergency room, but there is no record that she did so. So, even after J.D. had been removed from the Parents' home and DCS became actively involved in their lives, the record indicates that Parents still failed to provide J.G. with adequate medical care. Father has not

established that the juvenile court abused its discretion in finding J.G. to be a CHINS.[3]

# II.  Mother

[27]   Mother challenges the juvenile court's CHINS findings with respect to both J.D. and J.G.  Specifically, Mother argues that DCS failed to produce sufficient evidence to sustain a finding that J.D.'s injuries were anything other than accidental and that State intervention was required to provide either child with necessary care.

# A.  J.D.

[28]   The juvenile court found that "[J.D.]'s physical or mental condition is seriously impaired or seriously endangered due to an injury by the act or omission of the child's parent, guardian or custodian" pursuant to Indiana Code section 31-34-1-2.  Although not specifically cited by the juvenile court, we conclude that Indiana Code section 31-34-12-4 also applies in this case:

> A rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:

---

[3] Father also argues that the burden of proof was improperly shifted to Parents to prove that J.D.'s injuries were not the result of neglect or abuse.  This argument, however, is only advanced to challenge J.G.'s removal, on the alleged basis that the juvenile court removed J.G. because of what had happened to J.D.  As mentioned in the body, however, the juvenile court clearly based its finding that J.G. is a CHINS on evidence particular to her and not because of anything that happened to J.D.  Because Father's argument is based on a false premise, we need not address it further.

(1) the child has been injured;

(2) at the time the child was injured, the parent, guardian, or custodian:

    (A) had the care, custody, or control of the child; or

    (B) had legal responsibility for the care, custody, or control of the child;

(3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and

(4) there is a reasonable probability that the injury was not accidental.

[29] The juvenile court based its CHINS determination on evidence that in March and December of 2014, J.D. suffered injuries while in Mother's care, specifically, bruising to the face and, in December, also a bloody nose. Mother points to testimony that J.D. lacked coordination and was given to aggressive outbursts, as well as her own testimony that J.D. banged his head when asleep. The juvenile court, however, was in the best position to evaluate the evidence and specifically found Mother's testimony regarding how J.D. was injured in December of 2014 to be incredible. Moreover, Mother ignores other evidence, such as testimony that J.D. has never been observed "flailing" in his sleep while napping at Head Start, Tr. p. 151, and, since being placed with C.D., has suffered no bruising or marking to his face and has not been observed to bang his head while sleeping. The juvenile court was fully justified in finding J.D. to be a CHINS due to the injuries he suffered while in Mother's and Father's care, injuries that were not explained by evidence that the court found credible. Mother's argument in this regard is an invitation to reweigh the evidence, which we will not do.

## B. J.G.

[30] Mother also argues that DCS produced insufficient evidence to support a finding that J.G. is a CHINS. In the end, Mother's arguments are essentially the same as Father's, *i.e.*, that the juvenile court gave too much weight to certain evidence supporting its CHINS determination and failed to credit certain evidence that would undermine it. As we have already determined, however, DCS produced ample evidence that Parents have failed to provide J.G. with appropriate medical care that was unlikely to be provided without the intervention of the State. Mother's amounts to nothing more than an invitation to reweigh the evidence, which we will not do.

The judgment of the juvenile court is affirmed.

Baker, J., and Pyle, J., concur.